IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs August 9, 2016

**ARTURO JAIMES-GARCIA v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Davidson County**
**No. 2006-D-3175   Mark J. Fishburn, Judge**

---

**No. M2015-02109-CCA-R3-PC – Filed October 18, 2016**

---

The Petitioner, Arturo Jaimes-Garcia, appeals the Davidson County Criminal Court's denial of his petition for post-conviction relief from his 2007 drug-related convictions and his effective eighteen-year sentence. The Petitioner contends that he received the ineffective assistance of counsel. We affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., and J. ROSS DYER, J., joined.

Joshua L. Brand, Nashville, Tennessee, for the appellant, Arturo Jaimes-Garcia.

Herbert H. Slatery III, Attorney General and Reporter; Sophia S. Lee, General Counsel; Glenn Funk, District Attorney General; and Brian Ewald, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

This case arises from the Petitioner's selling cocaine to a confidential informant on three occasions. The Petitioner was convicted of conspiracy to sell 300 grams or more of cocaine within 1000 feet of a school, two counts of selling 26 grams or more of cocaine, possession with the intent to deliver 300 grams or more of cocaine within 1000 feet of a school, selling 300 grams or more of cocaine, and possession with the intent to sell or deliver 26 grams or more of cocaine. After the appropriate merger of convictions, the Defendant received an effective eighteen-year sentence at 100% service. The Petitioner appealed, and in its opinion affirming the convictions, this court summarized the facts as follows:

. . . Several officers, including James McWright, an officer with the Nashville Metro Police Department's 20th Judicial District drug task force, testified about the investigation that led to the arrest of the Defendant, his wife, his nephew, and his nephew's girlfriend. The investigation began when officers arrested Walter Sawyers, who agreed to cooperate with police and told police that a man named "Juan" supplied him with drugs. In cooperation with police, Sawyers arranged to purchase drugs from his supplier, "Juan," in a series of three transactions. Sawyers informed officers that "Juan's Uncle" sometimes assisted in the drug transactions.

Before the first drug transaction on August 3, 2006, officers knew only that Sawyers's supplier's name was "Juan" and that Juan and his uncle both participated in selling Sawyers drugs. Sawyers, who said he did not know where Juan or his uncle lived, contacted Juan by telephone and arranged the purchase of two ounces of cocaine for $1200. Officers gave Sawyers money to purchase the drugs. At the arranged time, Juan's uncle, who officers then determined was the Defendant, arrived and conducted the drug sale. Officers then followed the Defendant to apartment C-3 in the Holly Hills apartment complex, where the Defendant entered with a key, and the officers then began surveillance of his residence. Officer McWright followed the Defendant to multiple gas stations and apartment complexes that day before he terminated his surveillance. The officers intermittently conducted surveillance of the apartment they saw the Defendant enter, and they discovered that the Defendant also used apartment D-8 in the same apartment complex. Officers identified "Juan" as Juan Jeminez-Jaimes. Officer McWright obtained electric company records, which indicated that the electric bill for apartment C-3 was listed in the name Betsy Elizabeth Martinez, who he later learned was Jeminez-Jaimes's girlfriend, and the electric bill for apartment D-8 was listed in the Defendant's name.

In the second drug transaction, which occurred on August 8, 2006, Sawyers attempted to arrange a purchase of two ounces of cocaine from Jaminez-Jaimes for $1200. When Sawyers arrived, with $1200 of police drug buy money, he was met by the Defendant, who informed him that he thought Sawyers wanted to purchase two kilos of cocaine. Sawyers explained the mix-up, and Jeminez-Jaimes arrived and stayed with Sawyers while the Defendant returned to apartment D-8 with the two kilos of cocaine. The Defendant returned with a different amount of cocaine and inadvertently Sawyers ended up with eight ounces of cocaine, for which he had paid only $1200. After Sawyers left, Jeminez-Jaimes called Sawyers and asked him to return the drugs

he had received in error. Sawyers told Jeminez-Jaimes that he would purchase another half kilo the following day, and also pay Jeminez-Jaimes for the extra drugs that he had received. Sawyers agreed to give the Defendant $12,800 for the half-kilo of cocaine and the extra cocaine he had received in error.

In the third drug transaction, which occurred on August 9, 2006, Officer McWright along with other officers set up surveillance of apartments C-3 and D-8. Officers were following both the Defendant and Juan Jeminez-Jaimes and communicating with each other via police radio. Shortly after noon, Officer McWright saw the Defendant, Betzy Martinez, Martinez's younger sister, and a child exit apartment C-3. The Defendant entered apartment D-8, and the other three people left the complex in a SUV. Officer McWright then saw Jeminez-Jaimes exit apartment C-3 and leave the complex in a different SUV. Officer McWright followed Jeminez-Jaimes to Nashville Auto Sales, which is two to three miles from the apartments.

Later that day Officer McWright conducted surveillance of apartment D-8 based upon Sawyers's arrangement to purchase a half-kilo of cocaine from Jeminez-Jaimes[.] The officer observed the Defendant arrive at the apartments and speak to his wife, Antonia Diaz-Reyes. Diaz-Reyes went into apartment D-8, and the Defendant entered apartment C-3 using a key. The Defendant then left the apartment complex. Police officer Herbert Kajihara followed as the Defendant traveled on a road adjacent to Paragon Mill Elementary School on his way to another apartment complex. Officer Kajihara saw the Defendant stop at a three-way intersection, which dead-ended into the school. At that stop sign, where the Defendant stopped, he was within twenty-five feet of the school. The Defendant then turned left and drove past the school and traveled on to the apartment complex. When the Defendant arrived at the complex, he parked his car, opened the hood and the trunk, and stood near his car. It was the location of this drug sale that the State alleged was within a 1000 feet of a school zone.

After Sawyers arrived at the apartment complex parking lot, the Defendant took a bag of cocaine out of his trunk and gave Sawyers the cocaine. Sawyers gave the Defendant the money, which the Defendant "tossed" into the back seat of the Defendant's car. At that point, pursuant to Officer McWright's instructions, officers arrested the Defendant, who was still in possession of the $12,800 that Sawyers paid him. Officers retrieved the bag of cocaine from Sawyers and arrested Jeminez-Jaimes, as well.

Upon arrest, Jeminez-Jaimes gave police a false identity, and he was found in possession of false identification. He carried $6139 in cash and one cell phone, and officers found another cell phone in his Tahoe. Officers identified the telephone numbers of these cell phones and determined that multiple calls had been placed between these phones and the Defendant's phone on the day of the drug sale. Phone records also indicated that calls were placed between the phone Jeminez-Jamines carried and the phone belonging to Sawyers. Officers examined the paper money found on Jeminez-Jaimes, and some of the money matched the photocopies they had of the drug buy money used by Sawyers to purchase drugs during the second drug buy.

Officer McWright testified that he had previously obtained search warrants for both apartments C-3 and D-8, and that, after arresting the Defendant and Jeminez-Jaimes, he went to the apartments in anticipation of executing those warrants. The officer, however, had to wait for other officers to become available to assist him, so he set up surveillance. During this surveillance, he saw Reyes exiting apartment D-8 carrying a trash bag, so he asked another officer to take her into custody and to seize the trash bag. Betzy Martinez came back to the apartment, and officers arrested her before she entered the apartment. Officers then executed search warrants on both apartments.

In apartment C-3, officers, assisted by K-9 officers, found a half-kilo of cocaine in a purple bag, which was inside a Christmas tree box. They also found baggies, Inositol powder, which is used to cut cocaine, photographs and paper work. In apartment D-8, officers found two small bags of cocaine inside a box of zip baggies, a digital scale, baggies, and $700 in cash. In D-8, officers also found the Defendant's ID cards, a pay stub from past employment in another State, and family photographs. Upon searching Martinez's SUV, officers determined that the SUV had been purchased by Jeminez-Jaimes.

On cross-examination, Officers McWright, Thomas, and Rigsby each testified that he never personally observed the Defendant within 1000 feet of a school zone during the August 9 drug sale. The officers said that the investigation revealed that Martinez listed her employer as Nashville Auto Sales. During the cross-examination of the other officers who testified, the officers testified that Inositol, which is used as a cutting agent for cocaine, is sold legally as a baby laxative or vitamin supplement. The officers agreed children were sometimes at the apartment, and the Inositol could have been for

the children. On redirect, however, one officer noted that he saw no items belonging to a baby when he searched the apartment.

The State introduced audio recordings of the telephone calls between Sawyers and Jeminez-Jaimes setting up the drug buys. The State also introduced booking forms completed by the Defendant in which he listed his residence as apartment D-8 and did not offer any employment information.

Walter Sawyers, the confidential informant, testified that the State offered him a plea deal in part because of his cooperation with police during this investigation. Sawyers recalled the events leading to his arrest, stating that he and his wife were arrested shortly after delivering twenty pounds of marijuana and, after searching his home, police found more marijuana and over $100,000. Sawyers agreed to plead guilty to conspiracy to deliver over seventy pounds of marijuana, a Class B felony, in exchange for a split confinement sentence of eight years with one year served in prison and the remainder on probation. His wife also reached an agreement with the State in which she would plead to a Class C felony and serve a suspended three-year sentence.

After his arrest, Sawyers cooperated with police by disclosing the name of his supplier, Jeminez-Jaimes, and placing a call to Jeminez-Jaimes asking to purchase one hundred pounds of marijuana, a transaction the two had earlier arranged. Because Jeminez-Jaimes did not have any marijuana, Sawyers called him and asked to purchase two ounces of cocaine. The two agreed to a price of $600 per ounce and a meeting place to exchange the money for the drugs. All of Sawyers['s] telephone conversations with Jeminez-Jaimes were recorded and played for the jury. Sawyers said that, shortly after he arrived at the agreed meeting place, the Defendant brought him the drugs, and Sawyers gave the money to the Defendant. Immediately following the transaction, Sawyers went to the police precinct to give the purchased drugs to the police.

Sawyers testified that he called Jeminez-Jaimes to arrange the second drug transaction for two ounces of cocaine. Jeminez-Jaimes told him to go to the same meeting place. Jeminez-Jaimes arrived at the agreed upon location shortly after the Defendant and told Sawyers that the Defendant had brought two kilos, rather than the previously agreed upon two ounces. Jeminez-Jaimes said the Defendant was going to "go back" and "fix it." Sawyers said he and Jeminez-Jaimes stayed and talked while they waited for the Defendant to return. The Defendant arrived a short time later and handed Sawyers the

cocaine wrapped in a red towel. Sawyers paid the Defendant and returned to the police precinct where he discovered he had received more cocaine than he paid for. Jeminez-Jaimes called him and asked him to return the extra drugs. Sawyers relayed this information to police, who told him to ask Jeminez-Jaimes if he could pay him for the extra drugs, and also purchase an additional half of a kilo the following day. Jeminez-Jaimes agreed.

The following day, the third drug transaction occurred, and Sawyers went to the agreed upon meeting place in the parking lot of an apartment complex. When Sawyers arrived, the Defendant was already present. The two exchanged money for drugs after which Sawyers went to the police precinct and gave police the drugs.

Sawyers admitted he had several previous convictions, which included: possession of under .5 grams of cocaine, misdemeanor theft, misdemeanor criminal impersonation, possession of drug paraphernalia, resisting arrest, and escape. On cross-examination, Sawyers agreed he did not offer to cooperate with police until he was arrested on drug charges.

The State offered several witnesses who testified about Paragon Mills Elementary School. David Kline of the Metro Planning Department introduced a map he created that depicted the school with a 1000-foot ring around the school. Steve Keel with Metro Nashville Public Schools testified that Paragon Mills Elementary School had been in existence since 1965 and was open for enrollment on August 9, 2006, and that students likely were present at the school for registration at the time of the drug transaction. Keel agreed during cross-examination that none of the acts for which the Defendants were on trial endangered the children present at the school that day.

The State presented the testimony of two agents from the Tennessee Bureau of Investigation[] ("TBI") who testified about the substances received during the drug buys or as a result of the police search of apartments C-3 and D-8. Agent Dunlap testified that the substance received during the first drug buy was cocaine weighing a total of 55.5 grams. Agent Glenn said that the substance received during the second drug buy was cocaine weighing a total of 248.9 grams. Agent Glenn testified that he determined the substance received during the third drug buy was also cocaine that weighed 502.9 grams. Agent Glenn tested the substance found inside apartment C-3 and determined that it also was cocaine that weighed 251.6 grams. Agent Glenn tested the substance

found inside apartment D-8 and determined it was cocaine packaged in two separate baggies, one weighing 8.9 grams and the other weighing 7 grams.

The Defendant testified, through an interpreter, that he traveled from his apartment complex to another apartment complex, on August 9, 2006, but he said he took a different route than the one described by the officers who had testified. The route he described was not within the school zone. The Defendant said that, when he arrived at the second apartment complex, he conducted the "transaction" with the informant. The Defendant did not deny meeting Sawyers. On cross-examination, the Defendant testified he had lived in Nashville for three or four months before he was arrested in this case. During that time, he looked for work but was unable to secure employment based upon his lack of a social security number.

The Defendant said he conducted the three drug transactions with Sawyers and that Jeminez-Jaimes told him to deliver the drugs to Sawyers. The Defendant said another person gave the cocaine to him, which he then placed in apartment C-3, but he said he did not "really know them." He said he got the cocaine from apartment C-3 and took it to be delivered. The Defendant said that, after each buy, he gave the money he received to Jeminez-Jaimes. The Defendant agreed that he did not speak English and that Sawyers did not speak Spanish, so they need Jeminez-Jaimes, who spoke both, to interpret for them.

Jeminez-Jaimes testified that he was married and his "main residence" was with his wife in a location different from the apartments involved in this case. The Defendant, his uncle, sometimes borrowed money from him and he sometimes borrowed money from the Defendant. The two spoke on the phone frequently and spent the holidays together. Jeminez-Jaimes conceded that Betzy Martinez was his girlfriend with whom he rented apartment C-3. Jeminez-Jaimes said that, while the two shared an apartment, he visited Martinez usually twice a day but never spent the night in the apartment, instead returning to the home he shared with his wife. Jeminez-Jaimes denied any knowledge of the cocaine found in the apartment.

Jeminez-Jaimes said that he was employed part-time with a landscaping company, and he also bought, fixed up, and resold cars, which was, he said, quite profitable. Jeminez-Jaimes recalled that, around the time of these drug transactions, the Defendant told him that he needed his assistance communicating with another person. The Defendant gave him a telephone and

told him to answer it and tell him what the person said. The Defendant told him that he did not have to deliver or touch "it," so there was not going to be a problem. Jeminez-Jaimes said he felt obligated to help his uncle because his uncle needed money and did not understand English.

Jeminez-Jaimes maintained that he only translated for the Defendant, who told him what to say to Sawyers and where to tell Sawyers to meet. The Defendant asked Jeminez-Jaimes to tell him what Sawyers said in response. Jeminez-Jaimes explained that Sawyers told Jeminez-Jaimes that he could not hear him on the cell phone he was using, and Jeminez-Jaimes opined that this was perhaps because he was using a prepaid cell phone. He then gave Sawyers his personal cell phone number, which he used to communicate with Sawyers. Jeminez-Jaimes testified that the Defendant was in charge of the drug deals, and Jeminez-Jaimes's role was simply to facilitate communication. Jeminez-Jaimes explained that he was carrying a large amount of money when he was arrested because he was on his way to Nashville Auto Sales to purchase two cars. He had borrowed $1000 from the Defendant and the remaining $5000 belonged to him. He said he did not share in the proceeds from these drug sales.

On cross-examination, Jeminez-Jaimes testified that he knew when he was interpreting that he was interpreting for purposes of a drug transaction.

*State v. Arturo Jaimes-Garcia*, No. M2009-00891-CCA-R3-CD, 2010 WL 5343286, at *1-7 (Tenn. Crim. App. Dec. 22, 2010), *perm. app. denied* (Tenn. May 31, 2011).

On July 27, 2011, the Petitioner filed the instant petition for post-conviction relief alleging multiple grounds of the ineffective assistance of trial and appellate counsel. He contends that counsel failed to negotiate a plea agreement; failed to investigate the case, prepare for the trial, and advise him of the risks associated with testifying; and failed to preserve issues for the appeal.

At the post-conviction hearing, the Petitioner testified with the assistance of an interpreter that one of his codefendants, the Petitioner's nephew, paid for the Petitioner's trial counsel. The Petitioner said that he told counsel he did not want to go to trial because he was guilty but that counsel said the Petitioner had to go to trial. The Petitioner recalled the only plea offer the State extended was fifteen years at 30% service. He recalled counsel told him that the State would extend three offers and that the Petitioner should wait to accept an offer until the second offer was received. The Petitioner said that he returned to court six months later and that counsel said the prosecutors were not extending any additional offers. The

Petitioner said that he wanted to plead guilty at his first court appearance and that he told counsel he was guilty and did not want a trial. The Petitioner said that at the second court appearance, he asked counsel to determine whether the prosecutors would allow him to plead guilty and receive the fifteen-year sentence at 30% service. The Petitioner recalled counsel said that counsel could not do anything about a plea agreement at that point and that the Petitioner would have to go to trial.

The Petitioner testified that trial counsel had contact with the codefendants' counsel and that the Petitioner's counsel only did what the codefendants' counsel asked. The Petitioner said that counsel asked if the Petitioner would testify against the codefendants and that the Petitioner did not want to testify against his nephew and simply wanted to take responsibility for his unlawful conduct. Relative to the State's evidence, counsel told the Petitioner that the Petitioner drove in a school zone at the time of the offenses and that the police officers "had proof." The Petitioner said, though, counsel never showed him any evidence.

The Petitioner testified that he and trial counsel discussed whether the Petitioner would testify, that counsel suggested the Petitioner testify, that counsel said the choice whether to testify belonged to the Petitioner, and that the Petitioner testified at the trial that he delivered the cocaine. The Petitioner said that counsel told him to tell the truth during his testimony but that counsel did not say the Petitioner would receive a sentence that required 100% service. The Petitioner said counsel never told him that testifying was a bad idea or explained the benefits and pitfalls of testifying. The Petitioner said that counsel "never did anything" relative to the drug-free zone enhancement and that the Petitioner did not know it was a crime to be in a school zone with drugs. He said that counsel told him it was a crime just before the trial began.

On cross-examination, the Petitioner testified that he was arrested on August 9, 2006, and that the trial began about seventeen months later. He said that at the time of his arrest, he did not know driving through a school zone increased the penalty for drug offenses, although he knew possessing cocaine for the purpose of selling it was unlawful. He agreed trial counsel told him that drug activity within 1000 feet of a school increased the sentence length and required 100% service of the sentence.

The Petitioner testified that he did not speak English and that counsel did not show him the letter from the prosecutors stating the fifteen-year plea offer. He said counsel reported that the prosecutors extended plea offers to all of the codefendants, that the plea offers were contingent upon everyone pleading guilty, and that all of the codefendants would not agree to plead guilty. The Petitioner said that he understood he could not plead guilty because the codefendants would not plead guilty, as well. The Petitioner said that he wanted

counsel to inquire about a possible plea agreement just before the trial because the Petitioner feared receiving a sentence that required 100% service after a trial. He said counsel explained that if he went to trial, the sentence would require 100% service but that a plea offer might include 30% service.

The Petitioner testified that the trial court took a recess in order for trial counsel and the Petitioner to discuss whether the Petitioner would testify but that counsel did not talk to him about anything. The Petitioner denied discussing with counsel whether to testify. He said that during his trial testimony, he admitted he delivered cocaine but that the route he drove did not enter a school zone. He said the route he described at the trial was shorter but denied discussing with counsel that the shorter route did not enter a school zone. He agreed counsel told him that he would receive a fifteen-year sentence at 100% service if he were found guilty at a trial.

Trial counsel testified that although his practice at the time of the Petitioner's trial involved mostly civil matters, he represented the Petitioner in the trial court. He noted he was an assistant public defender early in his legal career. He said that a friend or relative of the Petitioner asked him to represent the Petitioner. He said that his first appearance on the Petitioner's behalf was the arraignment in criminal court. He recalled that the Petitioner was charged with selling cocaine and conspiracy to sell cocaine and that the offenses occurred within 1000 feet of a school. Counsel said the drug-free zone enhancement required 100% service, which was his largest concern.

Trial counsel testified that he met with the Petitioner and an interpreter five or six times before the trial and that at each meeting, they discussed the status of the Petitioner's case. Although counsel believed the Petitioner understood the charges, counsel thought the Petitioner had difficulty grasping the seriousness of the offenses. Counsel said that each time he talked to the Petitioner, the Petitioner appeared to understand what was happening but that the Petitioner asked the same questions at each meeting. Counsel said that he was not qualified to determine if the Petitioner fully comprehended their discussions but that counsel believed the Petitioner understood the situation.

Trial counsel testified that the State offered the Petitioner fifteen years at 30% service, that the offer was contingent upon each codefendant pleading guilty, and that he explained the offer to the Petitioner. Counsel said that some of the codefendants refused to plead guilty and that the Petitioner appeared to understand why the Petitioner could not enter a guilty plea. Counsel attempted to negotiate an independent plea agreement but said there was not much discussion from the lead prosecutor.

Trial counsel testified that he obtained redacted police reports before the trial, that the redacted portions were witness statements pursuant to rules of discovery, that counsel requested the redacted information, and that the prosecutor provided the redacted information after the relevant witnesses testified at the trial. He agreed the redacted information was related to police officer testimony regarding the Petitioner's location inside the drug-free zone. Counsel said that he was not surprised by the content of the redacted material and that he interviewed at least two police officers before the trial. Counsel recalled speaking with Detective Kajihara[1] and learned officers would testify at the trial about the Petitioner's whereabouts on the dates of the offenses. After reviewing the trial transcript, counsel said that he objected when the State elicited testimony about the Petitioner's proximity to the school zone. Counsel said that the basis of his objection was that the State failed to provide information in its discovery package about the Petitioner's driving through the school zone. Counsel agreed a jury-out hearing was held. He said that before the trial, he did not know verbatim the substance of the testimony of the officers, although he had a general idea of the testimony after speaking with Detective Kajihara.

Trial counsel testified that he attempted to speak to all of the police officers involved in the case before formulating his defense strategy, that one of the officers told him to perform an "unnatural act" on himself, and that after speaking with Detective Kajihara, the chosen defense strategy was to attack the drug-free zone evidence. Counsel said he and the Petitioner discussed this strategy.

Trial counsel testified that the driving route alleged by the police officers was illogical, that the most logical route was not within 1000 feet of a school, and that the Petitioner testified to taking the route not located within the school zone. Counsel said the Petitioner testified that he was familiar with the area and that the State's proposed route was illogical for someone familiar with the area. Counsel said he and the Petitioner discussed the need to show that the Petitioner did not enter a drug-free zone. Counsel said that he and the Petitioner discussed the pitfalls for many defendants testifying but that without the Petitioner's testimony, the only proof about the driving route would come from the police officers. Counsel denied telling the Petitioner he had to testify and said that they discussed the decision whether to testify belonged to the Petitioner. Counsel said that he believed the Petitioner needed to testify based upon the chosen defense strategy and that the Petitioner chose to testify.

Trial counsel testified that he considered filing a motion to sever the Petitioner's case from the codefendants' cases. He recalled speaking to the codefendants' attorneys but said

---

[1] The record reflects two spellings. We use Kajihara for consistency.

he did not recall the reason a motion to sever was not filed by anyone. Counsel said that he would have filed a motion to sever if he thought it would have been beneficial.

Trial counsel testified that at the motion for a new trial hearing, he told the trial court he was not retained for the appeal and that he again argued the State should not have been permitted to present evidence of the Petitioner's driving route. Although counsel agreed he argued at the trial that the witness testimony was an "ambush," counsel said he knew before the trial that the State intended to prove the Petitioner drove within 1000 feet of a school. Counsel said that although Detective Kajihara was willing to speak with him before the trial, the detective would not discuss the details of his potential testimony. Counsel said that another attorney was appointed for the Petitioner's appeal and that counsel was unaware until this court's opinion was released that an issue existed regarding the order denying the motion for a new trial.

On cross-examination, trial counsel testified that there were three or four codefendants and that he thought the Petitioner might have been the only person who wanted to plead guilty. Relative to attempting to negotiate an independent plea agreement with the State, counsel said that he asked the lead prosecutor why the Petitioner could not plead guilty and that the prosecutor refused unless everyone pleaded guilty. Counsel said the prosecutor's attitude was "all or nothing." Counsel said he approached the prosecutor from the perspective of common sense and humanity because the Petitioner was willing to plead guilty. Counsel said he did not suggest the Petitioner plead guilty in exchange for a twenty-year sentence at 30% service.

Relative to the driving route, trial counsel testified that Detective Kajihara told counsel "they had eyes on him the whole time." Counsel said that when he attempted to learn information regarding the specific route, the detective said, "[Y]ou'll just have to wait to see what happened." Counsel did not recall whether he questioned the lead prosecutor about the specific route. Counsel agreed his pretrial knowledge about the route was limited.

Trial counsel testified that he asked to be relieved from the Petitioner's case after the motion for a new trial hearing because he thought someone with more appellate experience was better equipped to work on the appeal. Counsel knew the appeal would be limited to the issues raised in the motion for a new trial.

Upon questioning by the post-conviction court, trial counsel testified that before the trial, he had the "map department" of the metropolitan government prepare an aerial map showing a 1000 feet circumference from the school. He agreed he had to address the issue of whether the Petitioner entered the drug-free zone.

-12-

Appellate counsel testified that he was contacted by the trial judge or the judge's assistant and that he was asked to accept an appointment to the Petitioner's case. Counsel said that he knew the Petitioner had been convicted and sentenced at the time of his appointment and that a motion for a new trial had been filed. He was unsure whether he knew if the motion for a new trial hearing had been held. Counsel agreed that he filed an amended motion for a new trial that included allegations not contained in trial counsel's motion for a new trial, that a hearing was held, and that appellate counsel began pursuing the appeal. Counsel noted, though, that when he contacted the lead prosecutor before filing the amended motion, the prosecutor told counsel the motion had already been denied. Counsel said that no order was entered reflecting a denial of the motion but that a minute entry reflected the denial. Counsel recalled that a hearing was held to determine whether he could file an amended motion and that counsel argued a minute entry did not deprive the trial court of jurisdiction. Counsel said that he was permitted to file the amended motion. Counsel noted that this court's opinion concluded, based upon a supreme court opinion released after the second motion hearing, that a minute entry was sufficient to deny a motion for a new trial.

On cross-examination, appellate counsel testified that sufficiency of the evidence was the sole issue alleged in trial counsel's motion for a new trial and that appellate counsel would have included the issue in his amended motion. Appellate counsel said that once he learned a problem might exist in filing an amended motion, he considered that the thirty-day requirement for filing a notice of appeal might elapse while he investigated whether he was permitted to file an amended motion. He conceded that thirty days elapsed and that his notice of appeal was, ultimately, untimely. He said that he should have filed a notice of appeal as a backup plan while he investigated and that he should have requested the trial court vacate the minute entry before the expiration of thirty days.

The post-conviction court denied relief. The court found after reviewing the record that the trial court entered the final judgment on December 17, 2007, that trial counsel filed the initial motion for a new trial on January 8, 2008, that the motion hearing was held on February 8, 2008, that a minute entry reflecting a denial of relief was entered on February 8, 2008, and that appellate counsel was appointed on February 25, 2008. The court found that appellate counsel filed a motion requesting permission to file an amended motion for a new trial, arguing that the trial court maintained jurisdiction in the Petitioner's case because no written order denying the motion for a new trial was entered, and that the trial court entered an order granting appellate counsel's request on April 10, 2008. The post-conviction court found that after a hearing on the amended motion, the trial court denied relief on April 8, 2009, and that the notice of appeal was filed on April 16, 2009.

The post-conviction court found that the Petitioner did not want to go to trial because he was guilty, that the Petitioner received a plea offer of fifteen years at 30% service, that the Petitioner wanted to accept the offer, that the offer was contingent upon all of the codefendants' pleading guilty, and that not all of the codefendants agreed to plead guilty. The court found that although the Petitioner believed the State would extend another plea offer, the State withdrew the contingent offer, which resulted in a trial. The court found that the Petitioner knew he would receive a sentence requiring 100% service if convicted at a trial.

The post-conviction court found that trial counsel advised the Petitioner to testify in an effort to dispute the route traveled during the offenses and that counsel told the Petitioner to testify truthfully, although the Petitioner did not want to testify against his codefendants. The court found that counsel told the Petitioner it was the Petitioner's decision whether to testify. The court found that counsel believed the drug-free zone issue was the most serious in the case, that counsel's strategy was to challenge the State's evidence on this issue, and that counsel discussed the strategy with the Petitioner.

The post-conviction court found that trial counsel met with the Petitioner at least five or six times and attempted to persuade the State to allow the Petitioner to plead guilty, regardless of whether the codefendants pleaded guilty. The court found that counsel spoke with several police officers before the trial, that only Detective Kajihara spoke with counsel, and that counsel believed the officers had followed the Petitioner during the offenses. The court found that counsel knew the route alleged by the State placed the Petitioner within 1000 feet of a school, that counsel had an aerial map of the area prepared, and that counsel explained to the Petitioner the only evidence disputing the route would come from the Petitioner's testimony.

The post-conviction court found that appellate counsel was unaware the motion for a new trial had been ruled upon at the time of counsel's appointment to the Petitioner's case, that counsel filed an amended motion for a new trial, which was denied, and that counsel's notice of appeal was untimely because the court had previously ruled on the motion for a new trial by a minute entry.

Relative to trial counsel's failure to negotiate a plea agreement, the post-conviction court concluded that counsel's performance was not deficient and that the Petitioner did not receive ineffective assistance. The court found that counsel's testimony contradicted the Petitioner's assertion that counsel told the Petitioner to wait for a subsequent plea offer. The court found that counsel and the Petitioner each testified that the fifteen-year plea offer was contingent upon all of the codefendants' pleading guilty and that at least one codefendant did not want to plead guilty. The court found that counsel attempted to persuade the lead

prosecutor to allow the Petitioner to plead guilty but that the prosecutor refused. The court found that the Petitioner did not "lose" his plea offer because it was never accepted.

Relative to trial counsel's failure to investigate the Petitioner's case and to prepare for the trial, the post-conviction court concluded that counsel did not provide deficient performance and that the Petitioner did not receive ineffective assistance. The court found that counsel knew the State planned to present evidence the Petitioner drove through a drug-free zone at the time of the offenses and that this issue was the focus of counsel's trial strategy. The court found that before the trial, counsel reviewed the police officers' redacted statements, had a map of the area created, and spoke with Detective Kajihara. The court found that counsel's reason for advising the Petitioner to testify was to refute the drug-free zone evidence.

Relative to trial counsel's failure to advise the Petitioner of the risks associated with testifying, the post-conviction court concluded that counsel did not provide deficient performance and that the Petitioner received effective assistance. The court found that the Petitioner and counsel each testified that the Petitioner was informed of his right not to testify but that counsel believed the Petitioner's testimony was necessary to dispute evidence that the Petitioner drove through a school zone at the time of the offenses. The court found that the Petitioner was the only person who could have provided such evidence because the Petitioner was the only person in the vehicle. The court found the Petitioner did not object to counsel's advice to testify.

Relative to trial counsel's failure to preserve issues on appeal, the post-conviction court concluded that the Petitioner failed to establish he was prejudiced by any deficient performance. The court found that although trial counsel informed the trial court that counsel was not retained for the Petitioner's appeal, counsel filed a motion for a new trial and argued several issues related to the sufficiency of the evidence. The court found that appellate counsel was unaware of the minute entry denying the motion, which ultimately resulted in counsel's filing an untimely notice of appeal. The court noted, though, that on appeal this court reviewed the issues raised by trial counsel on the merits and considered the additional issues raised by appellate counsel for plain error in the interests of justice.

Relative to appellate counsel, the post-conviction court concluded that appellate counsel did not provide deficient performance and that the Petitioner received effective assistance. The court found that appellate counsel was not required to raise every issue on appeal and that counsel had the discretion to decide which issues to include in the appeal. The court also found that it could not have granted a request for a delayed appeal by appellate counsel because the Petitioner received an appeal. The court found that although the issues raised by counsel were reviewed for plain error, nothing in the record reflected that the

-15-

Petitioner would have been granted relief had the issues received plenary review. This appeal followed.

The Petitioner contends that the post-conviction court erred by denying him relief. He argues he received the ineffective assistance of counsel because trial counsel failed to negotiate a plea agreement and to investigate the case, prepare for the trial, and advise him of the risks associated with testifying. He also argues that trial and appellate counsel provided ineffective assistance by failing to preserve adequately the issues for appeal. The State responds that the post-conviction court properly denied relief. We agree with the State.

Post-conviction relief is available "when the conviction or sentence is void or voidable because of the abridgement of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103 (2012). A petitioner has the burden of proving his factual allegations by clear and convincing evidence. *Id.* § 40-30-110(f) (2012). A post-conviction court's findings of fact are binding on appeal, and this court must defer to them "unless the evidence in the record preponderates against those findings." *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997); *see Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). A post-conviction court's application of law to its factual findings is subject to a de novo standard of review without a presumption of correctness. *Fields*, 40 S.W.3d at 457-58.

To establish a post-conviction claim of the ineffective assistance of counsel in violation of the Sixth Amendment, a petitioner has the burden of proving that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see Lockhart v. Fretwell*, 506 U.S. 364, 368-72 (1993). The Tennessee Supreme Court has applied the *Strickland* standard to an accused's right to counsel under article I, section 9 of the Tennessee Constitution. *See State v. Melson*, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

A petitioner must satisfy both prongs of the *Strickland* test in order to prevail in an ineffective assistance of counsel claim. *Henley*, 960 S.W.2d at 580. "[F]ailure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim." *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). To establish the performance prong, a petitioner must show that "the advice given, or the services rendered . . . , are [not] within the range of competence demanded of attorneys in criminal cases." *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975); *see Strickland*, 466 U.S. at 690. The post-conviction court must determine if these acts or omissions, viewed in light of all of the circumstances, fell "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. A petitioner "is not entitled to the benefit of hindsight, may not second-guess a reasonably based trial strategy by his counsel, and cannot criticize a sound,

-16-

but unsuccessful, tactical decision." *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994); *see Pylant v. State*, 263 S.W.3d 854, 874 (Tenn. 2008). This deference, however, only applies "if the choices are informed . . . based upon adequate preparation." *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). To establish the prejudice prong, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

## A. Plea Agreement

Relative to trial counsel's failure to negotiate a plea agreement, the record reflects that counsel and the Petitioner each testified that the State extended a plea offer to the Petitioner and the codefendants which provided for fifteen years at 30% service but that the offer was contingent upon all of the defendants' pleading guilty. The Petitioner testified that he knew all of the codefendants did not agree to plead guilty and that he understood he could not plead guilty because all of the codefendants would not plead guilty. The Petitioner requested counsel attempt to negotiate an independent plea agreement that was not contingent upon his codefendants' pleading guilty. Although counsel attempted to negotiate a plea agreement, the lead prosecutor refused and had an all or nothing attitude. Counsel said that he advised the prosecutor that the Petitioner wanted to plead guilty and that he attempted to appeal to the prosecutor's common sense and humanity. When counsel realized a plea agreement would not be possible, counsel focused on defense strategy. The record does not preponderate against the post-conviction court's finding that counsel did not provide deficient performance and its conclusion that the Petitioner received the effective assistance of counsel. The Petitioner is not entitled to relief on this basis.

## B. Failure to Investigate the Case, Prepare for the Trial, and Advise the Petitioner of the Risks in Testifying

Relative to trial counsel's failure to investigate the case, to prepare for the trial, and to advise the Petitioner of the risks associated with testifying, the record reflects that the Petitioner admitted his guilt to counsel and wanted to plead guilty. A plea agreement was not possible, and any defense strategy was limited by the Petitioner's guilt. Because the Petitioner admitted his guilt of the offenses but disputed driving through a drug-free zone, counsel's trial strategy focused on the driving route in an effort to reduce the service requirement of any sentence upon conviction. Counsel and the Petitioner discussed this strategy, and the Petitioner did not object.

Counsel testified that he received the State's discovery package, which contained redacted statements from the investigating police officers. Although counsel suspected the redacted information related to whether the Petitioner entered a drug-free zone during the offenses, counsel did not know the specific route about which the officers would testify. Counsel attempted to speak with all of the officers involved, but only Detective Kajihara agreed to speak to counsel. Their discussion confirmed counsel's suspicions that the redacted information related to the driving route, but Detective Kajihara would not reveal the State's alleged driving route. As a result, counsel had limited information about the alleged driving route. In any event, counsel had an aerial map prepared showing the 1000 feet circumference around the school, and counsel and the Petitioner discussed the route taken by the Petitioner. Counsel and the Petitioner discussed the defense strategy of attacking the State's proof related to the Petitioner's route through the drug-free zone and whether the Petitioner should testify. Counsel said that the Petitioner was familiar with the area where the offenses occurred and that the State's alleged route was illogical for someone who was familiar with the area. Counsel and the Petitioner discussed that evidence attacking the State's drug-free zone evidence was critical to the defense strategy and that such evidence could only come from the Petitioner's testimony because the Petitioner was alone in the vehicle. Counsel testified that he and the Petitioner discussed the potential pitfalls for defendants who chose to testify but that counsel advised the Petitioner to testify because of the need to refute the driving route. Counsel advised the Petitioner that the decision belonged to the Petitioner. The record does not preponderate against the post-conviction court's finding that counsel did not provide deficient performance and its conclusion that the Petitioner received the effective assistance of counsel. The Petitioner is not entitled to relief on this basis.

## C. The Appeal

Relative to the appeal of the Petitioner's convictions, he recounts in his brief the post-conviction hearing testimony of trial and appellate counsel regarding the tortured procedural history of the motion for a new trial and argues:

> [The] combined action of . . . trial and appellate counsel in the post-trial proceedings served to significantly deprive [the Petitioner] of a thorough opportunity to challenge his case at the appellate level. While he [may] have had a cursory review of sufficiency of the evidence, and a strict, plain error look at the other issues raised by appellate counsel, the actions of his attorneys in limiting this review cannot be said to be effective.

We interpret the Petitioner's argument to focus on trial counsel's failure either to raise issues other than sufficiency of the evidence in the original motion for a new trial or to request

-18-

additional time to allow for an amended motion. Likewise, we interpret the Petitioner's argument to focus on appellate counsel's inability to obtain plenary review of the additional issues counsel raised for the first time on appeal.

Relative to trial counsel, the record reflects that he advised the trial court that he was not retained to represent the Petitioner on appeal but nonetheless filed a motion for a new trial. Counsel argued the merits of the sufficiency of the evidence allegations in his motion for a new trial, and the trial court denied relief. No evidence was elicited at the post-conviction hearing regarding counsel's decision to include only allegations related to sufficiency of the evidence in the motion for a new trial. The trial court's minute entry denying the motion for a new trial transferred jurisdiction upon the appellate court, although appellate counsel, the State, and the trial court were equally unaware that the amended motion for a new trial and subsequent hearing were of no legal consequence. *See Arturo Jaimes-Garcia*, 2010 WL 5343286, at *9. In any event, appellate counsel raised an issue regarding the sufficiency of the evidence, to which this court's analysis devoted almost ten pages of the twenty-three-page opinion. We disagree with the Petitioner that this court's sufficiency of the evidence analysis was "cursory."

Unbeknownst to appellate counsel, the additional issues alleged on appeal were subject to waiver because of the untimely notice of appeal. However, this court reviewed the issues for plain error in the interests of justice. *Id.* at *20-23. Appellate counsel conceded at the post-conviction hearing that he should have filed a notice of appeal to preserve issues for the appeal while he investigated whether he could file an amended motion. We note, though, that the only issues alleged in the original motion for a new trial were aspects of the sufficiency of the evidence, which this court considered on the merits. Any notice of appeal filed by appellate counsel on the original motion would not have afforded the Petitioner plenary appellate review on any issues other than sufficiency of the evidence.

Appellate counsel raised an issue regarding the constitutionality of the drug-free zone statute, the State's failure to provide adequate notice of the intent to seek enhanced punishment pursuant to the drug-free zone statute, and prosecutorial misconduct during closing arguments. This court concluded that the Petitioner was not entitled to plain error relief on these issues. *Id.* at *20-21. Relative to whether the drug-free zone statute is overbroad and vague, this court noted that the statute had been determined in a previous case not to be overbroad or vague. *Id.* at *21 (citing *State v. Smith*, 48 S.W.3d 159, 164-68 (Tenn. Crim. App. 2000)). Moreover, this court noted that driving though a drug-free zone while en route to a drug transaction was sufficient to support the application of the statute. *Id.* at *21 (citing *State v. Vasquez*, 221 S.W.2d 514, 523 (Tenn. 2007)). The Petitioner has not shown that the outcome of the appeal would have been different had the court considered this issue on the merits.

Relative to whether the Petitioner received adequate notice of the State's intent to seek enhanced punishment pursuant to the drug-free zone statute, this court concluded that the State was not required to provide such notice under the statute. *Id.* at \*21 (citing T.C.A. § 40-35-202(A)). The court noted that a review of the indictment reflected the offenses were alleged to have occurred inside a drug-free school zone. *Id.* at \*21. The Petitioner has not shown that the outcome of the appeal would have been different had this court considered this issue on the merits.

Last, appellate counsel argued that the prosecutor's reference to the right to plead not guilty and proceed to a trial regardless of citizenship was prosecutorial misconduct. Although reviewed for plain error, this court concluded that the comment, in the context of the entire argument, more probably than not did not affect the outcome of the trial. *Id.* at \*23. Again, the Petitioner has not shown that the outcome of the appeal would have been different had the court considered the issue on the merits. We note that the Petitioner testified at the trial regarding his participation in the offenses. The only fact in dispute at the trial was whether the Petitioner traveled into a drug-free zone, and the Petitioner's convictions were affirmed after reviewing the sufficiency of the evidence.

As a result, the record does not preponderate against the post-conviction court's findings that the Petitioner failed to establish he was prejudiced by any deficient performance. The Petitioner is not entitled to relief on this basis.

Based upon the foregoing and the record as a whole, the judgment of the post-conviction court is affirmed.

_____
ROBERT H. MONTGOMERY, JR., JUDGE

-20-